JANE SHAW HEPBURN, respondent,

v.

UNITED WATER, GAS AND ELECTRIC COMPANY et al., appellants.

[Submitted March Term, 1917.   Decided June 18th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion:

I am unable to entertain a doubt touching the disposition that should be made of this case.

The primary question is whether or not this stock was transferred by Mr. Shaw to Mrs. Hepburn in good faith and for valuable consideration at the time claimed. I would have been better satisfied in this case if Mr. Shaw had been present and testified touching these various transactions, but it is impossible to give substantial weight to an adverse inference by reason of his absence. If this stock was in fact transferred in good faith by Mr. Shaw to his daughter for valuable consideration, as is claimed, he could not at this time in any way derogate the title of his daughter, but his testimony would be enlightening and of great value, whether his attitude may at this time be friendly to her or hostile.

There can be no doubt, I think, in the mind of anyone that Mr. Shaw was indebted to his daughter. No one could well question the fact that he owed her $35,000, even had he testified to the contrary, in view of the circumstance that upon his own books there is an account in recognition of that indebtedness. So, we can proceed, in any event, upon the assumption and with the fixed belief that he was honestly indebted to his daughter in an amount far in excess of the value of these certificates which are here in question. It matters not that Mr. Shaw had originally laid the foundation for or contributed to the fortune which she had, if he in fact subsequently borrowed from her.

The fact that he borrowed $35,000 from his daughter is not only declared against him by his books, but is fully' established by the testimony of the witnesses familiar with the transaction.    It follows that, owing her this money, it was his privilege, under the law of this state, to prefer her as a creditor, however much he may have been involved in his financial matters; even though he was at the time insolvent it was his privilege to pay to his daughter a debt which he honestly owed her, if he saw fit to do so, and in that manner constitute her a preferred creditor.    He had like power, if he saw fit, to give her this stock by way of security for the money which he owed her.

It seemed to me at one time, in listening to the testimony, that the transfer of this stock from Mr. Shaw to his daughter might have been, in legal contemplation, by way of suretyship, rather than as an absolute transfer for payment, as there appears to have been no definite amount of credit agreed upon; but I am not at all sure that that is so.

Mr. Hepburn has testified positively and unequivocally that the assignment of this stock was signed by Mr. Shaw in his presence and witnessed by him in May, 1915, and that the stock certificates, so transferred, were at the same time delivered to him by Mr. Shaw for Mrs. Hepburn on account of the then existing indebtedness of Mr. Shaw to Mrs. Hepburn.    If we are to doubt that this stock was transferred in that manner and at that time, as testified to by Mr. Hepburn, and for the purposes which he has testified, we are obliged to convict him in our minds of willful and deliberate perjury.    So, too, if we are to entertain a doubt that in January preceding Mr. Shaw promised to do what Mr. Hepburn says he did in May, we are likewise to convict Mrs. Hepburn of deliberate perjury, for she has said positively and unequivocally that in January her father promised to turn this stock over to her.

It is, undoubtedly, true that in the subsequent negotiations of Mr. Hepburn, touching the sale of this stock, he dealt with it in a manner that in some respects indicated that it really belonged to his father-in-law; but we must weigh those transactions in the light of the negotiations that were then pending. It is not reasonable, under the circumstances then existing, to

suppose that Mr. Hepburn would have found it necessary at every or even any stage of the proceedings he was conducting to be careful to declare that this stock was the property of his wife or that it had been transferred to her, although not in her name, upon the books of the stock company. Had he observed special care to make altogether unnecessary declarations of that kind it would have created more suspicion in my mind and would have been the source of more patent suggestion of some understanding of an improper nature between him and his father-in-law, with a view of avoiding creditors of his father-in-law, than the transactions which did transpire suggest. A careless attitude not infrequently suggests innocence of purpose. He knew, as has been shown, that at that time his father-in-law was pecuniarily embarrassed. The circumstance that he did not carefully guard against any conduct or statement indicating that this stock still belonged to his father-in-law indicates quite as fully his condition of mental security in his own then unchallenged position as a man who knew that the stock had been delivered to him for his wife in payment of a debt as it indicates that the transaction may not have been of that nature.

In a great number of suits of various kinds that have been tried before me where conveyances or transfers have been made and an attack upon their *bona fides* has been pending under a claim that they were only simulated, I have almost uniformly observed that the careful and studied conduct of a fraudulent grantor or grantee to avoid doing anything or saying anything that could by any possibility be urged as an indication of the want of *bona fides* in the transfer is one of the most powerful badges of fraud that exists. It more frequently occurs that the failure to protect oneself and to guard against a future claim of want of *bona fides* is evidence of good faith.

Now, without going into the details of the testimony of the case or discussing in detail its different aspects, I can say nothing that is really more forceful than to merely state that I fully believe that Mr. and Mrs. Hepburn have told the truth upon the witness-stand. I believe that this money was due to her; that in January, or thereabouts, her father promised to turn this stock over to her in payment of the debt, or as a security or for

her protection, and that later, in May, he did turn it over for that purpose, in the manner testified to by Mr. Hepburn. I cannot believe that either of those two witnesses have testified falsely, and if that is true, as I believe it is, there remains no doubt touching the disposition that a court is bound to make of this case. The stock then became the property of Mrs. Hepburn, and nothing that transpired after that, either by the conduct of Mr. Shaw or by that of his creditors, could in any way militate against her title. As owner of the stock she became entitled, and is now entitled, to have it transferred upon the books of the company that issued it, and a decree will be advised directing the officers of that company to transfer upon its books in the usual and customary manner these certificates of stock so that they may be placed in the name of Mrs. Hepburn.

If counsel will prepare a decree of that nature and submit it to the adversary, to see whether there is any objection to its form, I will advise it.

*Messrs. Grey & Archer,* for the appellant Pennsylvania Company for Insurance on Lives, &c.

*Messrs. Bleakly & Stockwell (Mr. C. J. Hepburn,* of Philadelphia, on the brief), for the respondent.

*Mr. Lewis Starr,* for other defendants-respondents.

PER CURIAM.

The decree is affirmed, for the reasons stated by Vice-Chancellor Leaming.

*For affirmance*—GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—13.

*For reversal*—None.